UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

SUSAN DEVENEY and CONFLICT
RESOLUTION TRAINING, INC.,

    Plaintiffs,

          v.

ELIZABETH OWEN, KATHERINE KO,
and THE HARMONY INSTITUTES
INC.,

    Defendants.

Case Number:1:24-cv-00127-AJ

## **FIRST AMENDED COMPLAINT**

Susan Deveney and Conflict Resolution Training, Inc., by and through their counsel,

Sheehan Phinney Bass & Green, P.A., hereby complain against Defendants Elizabeth Owen,

Katherine Ko, and the Harmony Institute, Inc. as follows:

### **i.    Introduction**

1.      Since 2010, Plaintiff Susan Deveney founded, built and operated a business called

Conflict Resolution Training, Inc. ("CRT").  CRT is a national continuing-education company

that trains career professionals in mediation and dispute resolution in various subject matters.

2.      In 2023, two CRT-trained students, Defendants Katherine Ko and Elizabeth

Owen, sought to purchase CRT.  After signing a nondisclosure and noncompetition agreement,

Ms. Ko and Ms. Owen conducted due diligence and the parties negotiated terms with Deveney

for the sale of CRT.  On November 14, 2023, the parties entered into separate identical Stock

Purchase Agreements ("SPAs") (one for each Defendant) in which Ms. Ko and Ms. Owen agreed

to purchase CRT for a total of $2,370,000, including an initial payment of $300,000 and

quarterly payments of $125,000 from March 31, 2024 through December 2026 and a final payment of $783,564 on or before March 31, 2027.

3.     As part of the transaction, on December 3, 2023, Ms. Ko, Ms. Owen, and Ms. Deveney entered into separate Loan Agreements, attached hereto as *Exhibit A*, in which Ms. Ko and Ms. Owen agreed to finance the purchase price through a loan (the "Loan"). The Loan Agreements include provisions regarding payments, default, non-competition and non-solicitation restrictions, attorney's fees, and a dispute resolution provision requiring the parties to litigate in New Hampshire state or federal court, among others. The Loan Agreements also identified specific collateral and required the parties to enter into future agreements to secure that collateral.

4.     One such source of collateral was the CRT shares themselves, which Ms. Ko and Ms. Owen pledged as security against an uncured default on the Loan Agreements.

5.     In December 2023, the parties entered into a Business Consulting Agreement ("Consulting Agreement") with an effective date of January 1, 2024, attached hereto as *Exhibit B*. Specifically, the Consulting Agreement required CRT to pay Zatony, Inc. ("Zatony"), a consulting company established by Ms. Deveney for the sole purpose of consulting with CRT, a total of $212,500 in equal monthly payments for one year for consulting services.

6.     However, without Ms. Deveney's knowledge, Ms. Ko and Ms. Owen never intended to comply with the terms of their agreements. Rather, from the beginning, Ms. Ko and Ms. Owen schemed to move forward with a sham purchase in which they would take control of the business, refuse to pay Ms. Deveney and Zatony what was promised, and refuse to enter into required agreements to secure the Loan with the promised collateral, use their non-payment and breaches of the agreements as leverage in an after-the-fact attempt to re-write their agreements—

and, when that did not work—start a competing business by improperly taking CRT's assets, corporate opportunities, and goodwill.

7.      Consistent with this plan, Ms. Ko and Ms. Owen began competing with CRT in secret, forming Defendant The Harmony Institutes Inc. ("THI")[1] for that purpose.  Ms. Ko and Ms. Owen did so despite continually representing to Ms. Deveney that they intended to live up to their financial commitments and own CRT long-term.  These representations, which were false, delayed Ms. Deveney from foreclosing and provided Ms. Ko and Ms. Owen time to establish THI by using and leveraging CRT's assets, opportunities, and goodwill—which they subsequently did.

8.      In July 2024, as a result of Ms. Ko's and Ms. Owen's breaches of the Loan Agreements, Deveney foreclosed on the CRT stock which Ms. Ko and Ms. Owen had pledged as security for performance under the Loan Agreements.

9.      Following that foreclosure, Deveney soon discovered that Ko and Owen had: undertaken efforts to devalue CRT by transferring its assets to THI and other third-party competitors; begun competing directly with CRT; and had used CRT's assets (including proprietary and copyrighted information) and goodwill to do so.

## ii.      Parties

10.     Plaintiff Susan Deveney is an individual who resides in Salem, New Hampshire.

11.     Plaintiff Conflict Resolution Training, Inc. is a Delaware corporation with a principal place of business in Boston, Massachusetts.

12.     Defendant Elizabeth Owen is an individual who resides in Pittsford, New York.

13.     Defendant Katherine Ko is an individual who resides in Tustin, California.

---

[1] Upon review of the California Secretary of State's website, the California Secretary of State's website reflects THI has been terminated as of November 21, 2024.

14.    Defendant the Harmony Institutes Inc. is a California stock corporation with a principal place of business in Irvine, California.

### iii.    **Jurisdiction and Venue**

15.    The Court has personal jurisdiction over Defendants Owen and Ko because Defendants contracted with Ms. Deveney, a New Hampshire resident, to, among other things, purchase her shares of CRT stock and borrow money from Ms. Deveney to finance that purchase.  Defendants' conduct has caused Ms. Deveney harm in the State of New Hampshire.

16.    The Court also has personal jurisdiction over Defendants Owen and Ko because, as explained below, they consented to the jurisdiction of New Hampshire courts through a fully-integrated agreement that was intended to govern disputes concerning the subject matter of this action.  The Court likewise has personal jurisdiction over THI pursuant to the jurisdiction provision within the aforementioned agreement, where THI is closely related to and/or the alter ego of Defendants Owen and Ko.

17.    The Court further has personal jurisdiction over THI because, as discussed below, THI has committed tortious activity directed at Ms. Deveney in New Hampshire, which did in fact cause Ms. Deveney harm in New Hampshire.  What is more, Ms. Ko and Ms. Owen formed THI, a California entity and used it to compete with CRT and undermine their obligations in the Loan Agreements for the purpose of avoiding the jurisdiction of this Court and making Ms. Deveney litigate this case in California.

18.    The Court has subject matter jurisdiction under 28 U.S.C. §1332, because there is complete diversity of citizenship between Ms. Deveney and Defendants, and the amount in controversy exceeds $75,000, exclusive of interests and costs.  The Court also has federal

question subject matter jurisdiction under the Copyright Act (17 U.S.C. §§ 101, *et seq.*) and supplemental jurisdiction over the remaining claims.

19.    Ms. Deveney is a citizen of the State of New Hampshire.

20.    Upon information and belief, Defendants Ko and Owen are citizens California and New York, respectively.

21.    Venue is proper in this district under 28 U.S.C. § 1391(a) and (b), as a substantial part of the events giving rise to the claims occurred in this District.  As evidence of that fact, the parties agreed through a fully-integrated agreement to adjudicate disputes concerning the subject matter of this action in New Hampshire courts.  Venue is also proper under 28 U.S.C. § 1400 because the Court has jurisdiction over each defendant.

### iv.    Facts

*Ms. Deveney Founded and Built Conflict Resolution Training, Inc.*

22.    Before starting CRT, Ms. Deveney attended and graduated from law school in 1986 and engaged in the practice of law on a full or part time basis until 2016.  She primarily handled employment matters, and early on began developing a mediation practice.

23.    Over time, Ms. Deveney realized that her passion and skillset was oriented towards mediation, and she began focusing on training individuals to become mediators.  From 2010 through 2023, Ms. Deveney carefully and successfully built a profitable mediation and conflict resolution training company.

24.    In 2010, Ms. Deveney initially established CRT as a Rhode Island corporation and ran it concurrently with her law office.  She started with a business model for mediating family court cases and training professionals in mediation.  She created a pilot program and began to develop training materials.

25.     From 2011 to 2015, CRT began offering classes throughout New England for training mediators.

26.     In 2016, Ms. Deveney expanded the program and developed other classes, based upon her practice in litigation, mediation and conflict resolution.  She began teaching these classes nationwide.

27.     In 2017 and 2018, Ms. Deveney began creating an advanced mediation training program using outside experts in business valuation and certified divorce financial analysts.

28.     In 2020, Ms. Deveney established the "Instructor Engagement Program" in which CRT would train independent instructors to teach CRT classes pursuant to which CRT provided a website to showcase the instructors' classes and some of the branding, marketing, advertising associated with the instructors' classes, and CRT and the instructors would split the profits generated from attendee fees.  Over the next few years, she trained more than a dozen independent instructors to teach classes.

29.     Having moved out of Rhode Island and built CRT into a national, post-graduate level training company for mental health, legal and business professionals, in 2022, Ms. Deveney established a new version of CRT in Delaware.  The assets of the Rhode Island entity were transferred to the Delaware entity.

30.     By 2023, CRT was conducting post-graduate level training of mental health, legal and business professionals in all U.S. states.  Ms. Deveney began to move into a licensing model, and engaged a licensing expert to assist.  CRT began creating a licensing product/package for its programs that could be offered worldwide.

31.     CRT's growth was reflected in its revenue numbers.  During the early years revenues were less than $100,000.  More recently, however, Ms. Deveney grew CRT's annual revenue to approximately $700,000.

32.     During the process of building and operating CRT, Ms. Deveney became an expert in the field of mediation training.  She received training from a program at Roger Williams University, a certification from Cornell University in conflict resolution, and a certification from Harvard Business School.

33.     Ms. Deveney has also published in her field.  She authored The Mediator's Guide to Writing Effective Memoranda of Understanding and numerous articles.  She also frequently lectured on various topics including conflict resolution, interpersonal communication skills, employee retention and engagement, mediation and other professional topics.

34.     Ms. Deveney has personally worked with and/or trained a variety of organizations as a mediator, workplace conflict resolution specialist and professional trainer, including nonprofit organizations, transportation companies, biotechnology firms, children's advocacy centers, manufacturing companies, national collective bargaining organizations, state and federal agencies and others.

*CRT's Success is Dependent, in part, on its Proprietary Information.*

35.     In large part, CRT's success has been built on the proprietary material that the company, primarily through Deveney, has developed to educate students about becoming mediators and to assist instructors in teaching and organizing mediation courses.  That material includes original content that CRT authored and developed, which it uses during instruction to promote student learning.

36.     CRT's proprietary information also includes the information that CRT developed to assist instructors in organizing, promoting, administering, and teaching mediation courses. This includes both instructor training videos and student handbooks, which teaches instructors CRT's methodology and techniques for teaching the content presented in its mediation courses, as well as provides the foundation for the student learning experience.  CRT's proprietary information also includes sensitive and confidential business information, such as customer information, customer contracts, pricing and financial information, customer pitches and proposals, and confidential business and marketing strategies and plans.  CRT treats this information as confidential and considers the information to be trade secrets.

37.     Deveney and CRT have diligently protected CRT's confidential intellectual property by, among other things, storing its confidential information in a password-protected drive, restricting access for certain materials, and requiring its independent instructors to sign nondisclosure and noncompete agreements.   For example, instructors given access to CRT's training videos only obtain access for a limited period of time.

*Defendant Ko's and Owen's Noncompete and Confidentiality Obligations as Instructors*

38.     Both individual defendants in this case, Katherine Ko and Elizabeth Owen, served as instructors for CRT and entered into noncompete, non-solicit agreements and nondisclosure agreements in connection with those roles.

39.     In July 2022, before beginning as a CRT instructor, Ms. Ko entered into a valid and binding agreement called an "Independent Instructor Agreement."  *See Exhibit C.*  Through that agreement, Ko agreed to learn and teach CRT's training programs in the area of Irvine, California.

40.     Defendant Elizabeth Owen also served as a CRT instructor.  CRT offered Ms. Owen an independent contractor position as a divorce mediation instructor with the company in 2020 by sending her a proposed Independent Instructor Agreement with an effective date of September 1, 2020.  *See Exhibit D.*  It was understood that Ms. Owen's engagement as a CRT instructor would be governed by the terms of the proposed Independent Instructor Agreement.

41.     Ms. Owen accepted those terms by performing under the agreement.  She did so by, among other things, taking CRT training, teaching courses, and collecting instructor fees under the agreement.

42.     In 2021, Ms. Owen requested that CRT allow her to teach workplace conflict courses as well.  In response to this request, CRT sent Ms. Owen a proposed Independent Instructor Agreement to govern her role as an instructor in CRT's workplace conflict program. *See Exhibit E.*  It was understood that Ms. Owen's engagement as a CRT instructor would be governed by the terms of the proposed Independent Instructor Agreement.  Ms. Owen, again, accepted the terms in this agreement by performing under the contract.

43.     Under each agreement, CRT agreed to, among other things, provide Ms. Ko and Ms. Owen with access and knowledge of its skill and experience in teaching the subject matter at issue, which included curriculum content, including training programs, training systems, methodologies and materials.

44.     The agreements each contained a confidentiality provision in which Ms. Ko and Ms. Owen promised not to disclose or use any confidential information disclosed to them in connection with the Agreement.

45.     Under the agreements, Ms. Ko and Ms. Owen agreed not to do the following things for the duration of the Agreement and for a period of two (2) years thereafter: (i) engage

in or "have an ownership interest in" any business that would be considered similar in nature to CRT's business; (ii) engage in any business with CRT's current or former clients, customers, contractors or agents in furtherance of such business within 50 miles of their respective training area; and (iii) solicit any independent instructor, independent contractor, officer, staff member or employee of CRT for any purpose.

46.     The term of Ms. Ko's Independent Instructor Agreement ran through December 31, 2023.

47.     Although the terms of Ms. Owen's Independent Instructor Agreements were set to expire on December 31, 2021 (for divorce mediation) and December 31, 2022 (for workplace conflict resolution), CRT and Ms. Owen mutually agreed to extend the terms of the agreement, as Ms. Owen continued as an instructor for CRT up through her agreement to purchase CRT's shares.

48.     All three agreements acknowledged that CRT would be entitled to injunctive relief for violations of the agreements' confidentiality, non-compete, and non-solicitation protections.

49.     Further, all three agreements contained indemnification clauses, through which the instructor indemnified CRT for costs and expenses—including reasonable attorneys' fees—related to any CRT claim arising out of or in connection with the instructor's breach of the agreement.

50.     Pursuant to the agreements, Ms. Ko and Ms. Owen gained access to CRT's course material, including its confidential course material relating to its instruction methodologies and training systems.

*Elizabeth Owen and Katherine Ko Entered into Various Agreements to Purchase CRT.*

51.    Predictably, CRT's success drew interest from potential purchasers.  Two of them were Defendants Elizabeth Owen and Katherine Ko.  As discussed above, Ms. Ko and Ms. Owen were both CRT-trained instructors who had separately approached Ms. Deveney over the past few years about how much they liked CRT and expressed interest in enhancing their roles with the company, including inquiries about potential ownership in CRT.  That interest came to fruition in the summer of 2023 when they discussed purchasing CRT with Ms. Deveney.

52.    To facilitate discussions about a purchase, Ms. Ko and Ms. Owen executed nondisclosure and noncompetition agreements, pursuant to which they were then provided access to confidential CRT information for the purpose of evaluating a potential sale.

53.    As a condition to receiving the diligence information, Ms. Ko and Ms. Owen each entered into a Nondisclosure and Non-Compete Agreement ("NDA and Noncompete Agreement") with CRT in September 2023.  *See Exhibit F*.  The NDA and Noncompete Agreements were effective for a period of three years after the date the parties terminated their discussions and information sharing.  Among other things, the NDA and Noncompete Agreements required Ms. Ko and Ms. Owen to refrain for a period of two years after the respective agreement's termination from being involved in a business "that would be considered similar in nature" to CRT's or doing business with CRT's current or former clients within 50 miles of CRT's business territories.  The NDA and Noncompete Agreements also prohibited Ms. Ko and Ms. Owen from soliciting CRT's clients, students, graduates, faculty partners, customers, officers, staff, or employees for the benefit of any party engaged in a business similar to CRT's.

54.    After conducting their due diligence, Ms. Ko and Ms. Owen entered into separate Stock Purchase Agreements with Ms. Deveney on November 14, 2023 that set forth the general

terms for their purchase of CRT.  In effect, the SPAs transferred 50% of CRT's stock to each of the individual defendants (Ms. Ko and Ms. Owen) in exchange for a total payment of $2.37 million, with $300,000 up front and regularly scheduled loan payments for the remaining amount ($2.07 million) over the course of three years, beginning with the first payment on March 31, 2024.  The SPAs necessarily contemplated the parties entering into additional, subsequent agreements.

55.     On December 3, 2023, Ms. Ko and Ms. Owen each entered into separate Loan Agreements with Ms. Deveney to finance the remaining $2.07 million.  In addition to the payment requirements, the Loan Agreements also required the individual defendants (Ms. Ko and Ms. Owen) to provide sufficient written promissory notes and collateral for the Loan.

56.     The Loan Agreements required that Ms. Ko and Ms. Owen pledge the CRT stock that they were purchasing as collateral for performance of the obligations in the Loan Agreements.  Pursuant to this security arrangement, Ms. Deveney retained the outstanding CRT stock, holding it as pledgee.  The Loan Agreements also required Ms. Ko and Ms. Owen to provide other collateral as security for the Loans.

57.     For Ms. Ko, the Loan Agreement required her to provide collateral in the form of (i) 49% of the issued and outstanding stock of Katherine Ko, Ph.D. & Associates, a Psychologist Corporation (her side business) to be held in trust; and (ii) 50% of the CRT issued-stock to be held by Ms. Deveney's agent.  These were to be held until Ms. Ko made all the required payments.  The Loan Agreement also required that Ms. Ko execute a promissory note.

58.     For Ms. Owen, the Loan Agreement required her to provide collateral in the form of (i) placing three pieces of realty that she and/or related entities owned into a "deed of trust"

held by Ms. Deveney; and (ii) 50% of the CRT issued-stock to be held by Ms. Deveney's agent in pledge.   The Loan Agreement required Ms. Owen to execute a promissory note.

59.    The Loan Agreements contain default provisions (and a 30-day cure period), as well as non-compete and non-solicitation covenants against Ms. Deveney.  In conjunction with these restrictive covenants, the Loan Agreements also contemplate that the parties enter into a separate agreement between CRT and Ms. Deveney for consulting services.

60.    The Loan Agreements contain a provision requiring, in the event of a material breach, that the breaching party indemnify the non-breaching party for attorney's fees and out-of-pocket costs relating to or caused by the breach of the Loan Agreements.  The provision also provides that an uncured default is a material breach of the Loan Agreement.

61.    Importantly, the Loan Agreements call for the parties to litigate any dispute in New Hampshire state or federal courts using New Hampshire law.  The Loan Agreements contain an integration clause stating "[t]his Agreement sets forth the entire agreement between the Parties with regard to the subject matter hereof.  All prior agreements…with respect to the subject matter hereof, are superseded by this agreement."  Thus, with the Loan Agreements' dispute resolution provision, the parties intended to supersede the SPAs' prior arbitration provision.

62.    Finally, on December 21, 2023, CRT and Zatony, Inc. (a company set up and owned by Ms. Deveney) entered into a Consulting Agreement.  The Consulting Agreement requires CRT to pay Zatony $17,710/month for 11 months (beginning in January 2024) and $17,690 for the final month in exchange for Zatony (through Ms. Deveney) providing various services to CRT.

*Defendants Take Ownership of CRT Despite Refusing to Pay for It and Then Use CRT's Assets to Set up a Competitor.*

63.     Following the purchase of CRT's stock, Ms. Ko and Ms. Owen became co-presidents and officers of CRT.

64.     Following Ms. Ko and Ms. Owen's purchase of CRT's stock, Ms. Deveney undertook several efforts to ensure that Ms. Ko and Ms. Owen would succeed owning and operating CRT, including creating a marketing plan that included a university partnership plan, through which CRT would partner with higher educational institutions to offer CRT's courses to students.  Ms. Ko and Ms. Owen expressed immediate interest in the university partnership plan and began working on it immediately.

65.     Despite Ms. Deveney's role as CRT's business consultant, and her knowledge of CRT's business, Ms. Ko and Ms. Owen did not disclose any details about the meetings that they were conducting with the higher educational institutions.

66.     By mid-February, Ms. Ko and Ms. Owen had still not provided Ms. Deveney with the security required under the Loan Agreements, despite Ms. Deveney's repeated requests to both that they satisfy their obligations under the Loan Agreements to provide adequate security.

67.     On February 15, Ms. Owen assured Ms. Deveney, speaking on Ms. Ko's behalf, that she and Ko were "not backing out" and that Ms. Deveney "will not need to take the company back. Promise."

68.     At around the same time, on February 15, 2024, Ms. Ko and Ms. Owen secretly purchased an alternative CRT website domain, named CRTusa.org.  Ms. Ko and Ms. Owen did not tell Deveney about the alternative website domain.  On information and belief, the only purpose of creating a new CRT domain would be to hide business operations from Ms. Deveney

despite her consultant role.  On information and belief, this was Ms. Ko and Ms. Owen's intended purposes of creating the new CRT domain.

69.      On March 4, 2024, Ms. Ko downloaded data from CRT's password protected database, which stored CRT's confidential information, including instructor training videos, instructor content, business plans, customer information, customer contracts, and customer lists. Specifically, Ms. Ko downloaded 23 documents stored on CRT's password protected drive.  The downloaded CRT documents were then saved onto a personal dropbox not owned by CRT.

70.      On information and belief, Ms. Ko and Ms. Owen used these downloaded materials and other CRT-owned information and assets for their own purpose and benefit. Among other uses, and on information and belief, Ms. Ko and Ms. Owen used the information to set up a new entity to compete with CRT, ultimately transferring valuable CRT assets and confidential information to that new entity.

71.      In mid-March, Ms. Ko and Ms. Owen informed Ms. Deveney that they did not intend to make the first installment payment under the loan.  As an explanation, they told Deveney that they were unable to make the first payment because they were not receiving enough revenues from CRT to do so.  When pushed by Ms. Deveney to perform under the Loan Agreements, Ms. Owen reassured Deveney that she did not intend to default on her obligations.

72.      Without any legal justification, on March 31, 2024, Ms. Ko and Ms. Owen failed to pay $125,000 to Ms. Deveney as required by their Loan Agreements.

73.      CRT also failed to pay Zatony its monthly payment obligations pursuant to the terms of the Consulting Agreement.

74.      Accordingly, and as set forth by the Loan Agreements, on April 1, 2024, Ms. Deveney served Default Notices upon both individual defendants (Ms. Ko and Ms. Owen).  Ms.

Ko and Ms. Owen failed to cure within 30 days, and continued to refuse to pay Ms. Deveney what they owe her under the Loan Agreements.

75.    On April 9, 2024, Ms. Ko and Ms. Owen's attorneys wrote to Ms. Deveney's attorneys and stated that Ms. Ko and Ms. Owen had the ability and intention to comply with the Loan Agreements' terms.

76.    On April 10, 2024, in response to Ms. Deveney seeking the outstanding payment and collateral, Ms. Owen wrote to Ms. Deveney and, speaking on Ms. Ko's behalf, explained that they had "nothing to hide," that "WE ALL have the company's best interest in mind," and that they were "hopeful" that the parties would "get [] back on track."  These representations—which Deveney relied on—were, on information and belief, designed to get Ms. Deveney to delay foreclosing on CRT's stock and to buy Ms. Ko and Ms. Owen additional time to use and leverage CRT's opportunities, information, and assets.

77.    These representations, however, were false.  Despite assuring Ms. Deveney that they wanted to get their relationship "back on track," Ms. Ko and Ms. Owen continued to take steps to establish an entity to compete with CRT.

78.    On April 12, 2024, Ms. Ko sent an email on behalf of Ms. Ko and Ms. Owen to some of CRT's special education instructors telling them "we will have an entity to do what we believe in and we would still love to have you on board . . . we will give you updates as they develop."

79.    On April 23, 2024, Ms. Ko purchased and registered a new domain name called "TheHarmonyInstitutes.org."

80.     And on the next day, on April 24, 2024, THI was registered as a stock corporation in California with Ms. Ko as the registered agent.  A website subsequently set up for THI identifies Ms. Ko and Ms. Owen as co-CEOs of the entity.

81.     Ms. Ko and Ms. Owen did not inform Ms. Deveney that they were opening THI, nor did they inform Ms. Deveney that they were starting a new domain for another entity.

82.     Shortly after creating THI, Ko and Owen began reaching out to multiple potential university partners with whom they had been negotiating partnership deals on CRT's behalf since February.  Ms. Ko and Ms. Owen requested that the potential partners change the name of the contracting party on their draft contracts from CRT to THI.

83.     Defendants explained this switch by peddling misrepresentations and misinformation to the potential CRT partners.  In some instances, they falsely told the prospective partners that the change was just the result of "rebranding," insinuating that THI and CRT were really the same entity and suggesting to one potential partner that CRT was merely a "DBA."

84.     In other instances, they represented to their potential partners that THI was simply the parent company to certain CRT subsidiaries.

85.     These representations were false, and they were intended to divert CRT's corporate opportunities to Ko, Owen and THI and to do so by trading off the good reputation of CRT.

86.     As a result of those misrepresentations, THI, through Ko and Owen, ultimately signed agreements with California, Inc. d/b/a The Chicago School of Professional Psychology ("The Chicago School") and Alliant International University ("Alliant") to develop, market, and

provide mediation courses, starting with a divorce mediation course. These contracts were CRT corporate opportunities that Ms. Ko and Ms. Owen diverted to THI for their own benefit.

87.    Ms. Ko and Ms. Owen also interfered with other CRT opportunities, including one in Canada, by making the same or similar misrepresentations to potential partners about "rebranding."

88.    Although Ms. Ko and Ms. Owen had already started competing against CRT with a different entity, they still falsely told Ms. Deveney that they wanted to complete the purchase of CRT. For example, in an early May meeting with Ms. Deveney, Ms. Ko and Ms. Owen: (i) told Ms. Deveney that they remained enthusiastic about their purchase of CRT and were committed to continuing their work toward its future success; (ii) said that they still intended to keep their financial commitments relative to CRT's purchase; and (iii) reaffirmed the parties' agreement that payment of their respective loan obligations were not conditioned upon their performance as the new owners of CRT, or their results with operating CRT.

89.    These representations were false, as demonstrated by Ms. Ko and Ms. Owen's efforts to create a competing entity with CRT and then divert CRT opportunities to that company.

90.    During the course of their CRT ownership, Ms. Ko and Ms. Owen made several reassuring representations like this to Ms. Deveney in response to Ms. Deveney's questions about the collateral or payments required under the Loan Agreements. These representations were false. Ms. Ko and Ms. Owen made these representations to delay Ms. Deveney's foreclosure on CRT stock and to allow both of them additional time to leverage and use CRT's assets, corporate opportunities, and proprietary information to establish THI.

91.     Deveney relied on these representations, including those in early May, and delayed foreclosing on Ms. Ko and Ms. Owen, believing that both Ms. Ko and Ms. Owen wanted to salvage their agreements to purchase CRT.

92.     Ms. Ko and Ms. Owen used Ms. Deveney's delay as a means to use and leverage CRT assets and information in an effort to compete in the marketplace.

*Defendants Compete Against CRT by Stealing CRT's Original Works
and Proprietary Information.*

93.     In their agreements with Alliant and The Chicago School, THI agreed to develop and teach THI courses for each institution.  Presumably unbeknownst to those entities, however, Defendants planned on providing courses that were knock-offs of CRT's and were identical to CRT's courses in virtually all material respects.  Also, presumably unbeknownst to the institutions, Defendants planned on stealing CRT's proprietary information to offer its courses, including CRT's copyrighted works and confidential information.

94.     The first program that THI offered through Alliant and The Chicago School was its "Divorce Mediation Certificate Program," which was designed to replicate CRT's own "Divorce Mediation Certificate Program."  THI's divorce mediation program was identical in material aspects to CRT's.  Indeed, Defendants improperly used and misappropriated CRT's proprietary information to sell the course and teach it to students.

95.     For example, in May 2024, THI, contemporaneous with signing its contract with Alliant, provided written "promotional material" for its divorce mediation program.  The promotional material copied *nearly verbatim* large portions of CRT's promotional material explaining the content and learning objectives in CRT's divorce mediation program.

96.     Alliant posted a portion of this material on its website promoting the divorce mediation course being offered by THI.  *See* Screenshots from Alliant's website attached hereto

as *Exhibit G*.  As demonstrated by the below chart, the description of THI's divorce mediation course that THI provided to Alliant, and Alliant then posted to its website, is a substantially similar copy of CRT's description of its divorce mediation program:

| Alliant Website Description of THI Course | CRT Website Description of CRT Course |
|---|---|
| The Divorce Mediation Certificate Program will teach you everything you need to know to begin work as a Divorce Mediator immediately upon Certification. This comprehensive, post graduate level program will teach you everything about handling a divorce mediation case from the time your clients call to schedule an appointment to the time they leave your office with a complete agreement on all the terms of their divorce. | The Divorce Mediation Certificate Program will teach you everything you need to know to begin work as a Divorce Mediator immediately upon Certification. More than just the basics of divorce mediation, this comprehensive, post graduate level program will teach you everything about handling a divorce mediation case from the time your clients call to schedule an appointment to the time they leave your office with a complete agreement on all of the terms of their divorce. |

97.     Similarly, The Chicago School also posted material on its website to promote THI's divorce mediation program that was a substantially similar copy of the material on CRT's website.  *See Exhibit H*.  Specifically, The Chicago School copied *nearly verbatim* several parts of CRT's website for divorce mediation, including CRT's description of its divorce mediation course, CRT's "included with tuition section," CRT's course curriculum description, and CRT's lengthy list of the course's learning objectives.  *Compare Exhibit H (a PDF printout of Chicago's website) with Exhibit I (a PDF printout of CRT's website).*

98.     Appendix A to this Amended Complaint contains an analysis of select language that THI and The Chicago School copied from CRT's website.  *See Exhibit J*.

99.     Alliant's and The Chicago School's copying of CRT's marketing material was unauthorized and unlawful.

100.    The material that Defendants and their university partners copied from CRT's website was original content created by CRT for which CRT owns valid copyright registrations. *See Exhibit K.*

101.    Beyond marketing material, THI also used, distributed, and copied the course content that CRT had developed for its divorce mediation program.  For example, in February 2024, Ms. Ko and Ms. Owen, on behalf of CRT, submitted CRT's course material to Alliant to get approval for CRT's divorce program, a submission which included CRT's divorce mediation student manual and instructor manual.  Ms. Ko and Ms. Owen did not substitute that material with original THI material after they induced Alliant to do business with THI instead of CRT. Further, on information and belief, Defendants and Alliant distributed CRT's student material to students enrolled in the THI divorce mediation course.

102.    Similarly, evidence shows that THI submitted copies of CRT divorce mediation course material to the Chicago School, including providing copies of CRT's draft contract for mediation services and a substantially similar copy of CRT's slide deck for the course on June 10, 2024, which are contained in CRT's divorce mediation student book.  Upon providing the draft contract for mediation services and the aforementioned slide deck to The Chicago School, Ms. Ko specifically requested that the materials be materials be circulated to the students enrolled in the forthcoming course prior to the course's start date.  As shown in Appendix B to this Amended Complaint, Defendants copied the content of CRT's slides with some minor revisions, while also changing the slides' colors and visual background.  *See Exhibit L.*

103.    The CRT divorce mediation student material contains original content that CRT authored to provide instruction to students who took CRT courses.  CRT owns valid copyright registrations in this work.  *See Exhibit M.*

104.    As described above, Defendants are offering what is, effectively, an imitation of CRT's divorce mediation course.  Defendants cannot offer such content without making use of CRT's confidential teaching methodologies, training, and techniques.

105.    Similarly, the speed with which Ms. Ko and Ms. Owen transitioned from operating CRT to then opening and operating a competing business with a competing business plan shows that Defendants likewise used CRT's confidential and trade secret protected business information, including (among other things) customer information, pricing information, confidential proposals, and business plans.

 Accordingly, in the course of offering courses that are imitations of CRT's, Defendants have used the trade secret protected teaching methodologies and instructor training materials that CRT has developed and perfected.  Defendants are also actively marketing this imitation course to consumers in the marketplace.  In doing so, Defendants have used CRT's confidential information and trade secrets relating to its customer information, pricing and financial information, and business and marketing strategies.

*Defendants Continue to Compete with CRT.*

106.    Beyond the divorce mediation program, Defendants intend to offer, through THI, Special Education Mediation, Workplace Culture, and Elder Care courses, all of which are courses offered by CRT.

107.    Upon information and belief, Defendants intend to use confidential and proprietary information, including CRT's trade secrets, to establish these courses and offer them in the marketplace.

108.    Defendants also intend to offer these courses and utilize confidential, copyrighted and proprietary information with its university partners.  For example, on or about August 19,

20204, Defendants submitted a special education course—a course, on information and belief derived from CRT's confidential, copyrighted and proprietary information—for The Chicago School's approval.  Pursuant to this submission and CRT materials submitted by the Defendants to the Chicago School, The Chicago School created a landing page for Defendants to market and advertise its forthcoming course offering.

### v.    Counts

### Count I (Against Ms. Ko and Ms. Owen)
### Breach of Contract

109.    Plaintiffs incorporate by reference the alleged facts in all preceding paragraphs.

110.    Ms. Ko and Ms. Owen entered into valid and enforceable Loan Agreements to facilitate their purchase of CRT stock.

111.    Under the Loan Agreements, Ms. Ko and Ms. Owen agreed to pay Ms. Deveney regularly-scheduled payments of $125,000 from March 31, 2024 through March 31, 2027.

112.    Without any legal justification, on March 31, 2024, Ms. Ko and Ms. Owen failed to make the first of those $125,000 payments to Ms. Deveney as required by their Loan Agreements.

113.    Ms. Deveney has provided Ms. Ko and Ms. Owen with a notice of default pursuant to the Loan Agreements.  Ms. Ko and Ms. Owen have failed to cure the default.

114.    As a result of Ko's and Owen's default, Ms. Deveney was forced to foreclose on the CRT stock, incurring additional costs and fees.

115.    Ms. Ko and Ms. Owen have breached their respective Loan Agreements with Ms. Deveney.

116.    As a direct and proximate result of Ms. Ko's and Ms. Owen' breaches, Ms. Deveney has suffered damages in an amount to be determined at trial, including but not limited to her attorneys' fees, lost income, the lost value of the business, and lost loan payments.

<strong><u>Count II (Against Ms. Ko and Ms. Owen)<br>Breach of Covenant of Good Faith and Fair Dealing</u></strong>

117.    Plaintiffs incorporate by reference the alleged facts in all preceding paragraphs.

118.    Ms. Ko and Ms. Owen entered into valid and enforceable Loan Agreements and SPAs to facilitate their purchase of CRT stock.

119.    Implied into the Loans Agreements and SPAs is a covenant that Ms. Ko and Ms. Owen would act in good faith and deal fairly toward Ms. Deveney.

120.    Ms. Ko and Ms. Owen breached the implied covenant by misrepresenting their intent to comply with the provisions of the Loan Agreements, including the payment provisions and the collateral obligation provisions.

121.    Ms. Ko and Ms. Owen have breached the implied covenant by refusing, in bad faith and with malicious intent, to pay Ms. Deveney sums owed under the Loan Agreement.  Ms. Ko and Ms. Owen have also, in bad faith and with malicious intent, failed or refused to complete the appropriate and necessary documents to effectuate their collateral obligations under the Loan Agreement.  For example, Ms. Ko was sent a stock pledge agreement for the collateral pledge of the 49% of Katherine Ko, Ph.D. & Associates, a Psychologist Corporation, on February 23, 2024 to which she did not respond and Ms. Owen refuses to discuss or approve any mortgage associated with the properties.

122.    Ms. Ko and Ms. Owen breached the implied covenant by unfairly attempting to leverage their nonpayment—along with their refusal to complete their collateral obligations—to

coerce Ms. Deveney to renegotiate the terms of their deal on more favorable terms to Ms. Ko and Ms. Owen.

123.    Ms. Ko and Ms. Owen have also breached the implied covenant by misrepresenting their intent to perform on their obligations on the Loan Agreements for the purpose of buying time to divert assets from CRT, trade of CRT's goodwill and reputation, set up a competing entity.

124.    Ms. Ko and Ms. Owen have also breached the covenant of good faith and fair dealing by using the discretion afforded them under the Loan Agreements and SPAs to divert assets, corporate opportunities, and goodwill from CRT to a competing entity, thereby purposefully devaluing the security that Ms. Deveney bargained for in the agreement.

125.    As a direct and proximate result of Ms. Ko's and Ms. Owen's ongoing breaches, Ms. Deveney has suffered damages and continues to suffer damages in an amount to be determined at trial, including but not limited to her attorneys' fees, lost income, and the lost value of CRT's business.

### Count III (Against Ms. Ko and Ms. Owen)
### Fraudulent Misrepresentation

126.    Plaintiffs incorporate by reference the alleged facts in all preceding paragraphs.

127.    Through the SPAs, Ms. Deveney sold Ms. Ko and Ms. Owen all outstanding shares of CRT's stock in exchange for Ms. Ko and Ms. Owen' promises in the SPAs and the Loan Agreements that Ms. Ko and Ms. Owen would pay a total of $2.37 million for CRT's outstanding stock, with $2.07 million of that amount paid through Ms. Ko's and Ms. Owen's respective Loan Agreements.  Ms. Ko and Ms. Owen also promised that they would provide significant collateral to secure payment of the Loan Agreements.

128.    These statements and promises were false.  From the beginning, Ms. Ko and Ms. Owen never intended to follow through on their promises of payment and their collateral obligations in the Loan Agreement.

129.    Instead, Ms. Ko and Ms. Owen intended to use their misrepresentations to gain access to CRT's assets and confidential information so that they could use that property in forming an entity competing with CRT.

130.    Ms. Ko and Ms. Owen knew that their promises of payment and promises to provide collateral were false or they were consciously indifferent to the truth of those promises.

131.    Ms. Ko and Ms. Owen also made several representations to Ms. Deveney after the Loan Agreements were executed, in which they indicated that they intended to provide the performance required under the Loan Agreement and to finalize their purchase of CRT.

132.    But, these statements were false.  In fact, at the time, Ms. Ko and Ms. Owen were taking steps to compete with CRT through a wholly different entity.

133.    Ms. Owen's and Ms. Ko's failure to disclose their efforts to compete with CRT was also a material and misleading omission, especially in light of their reassurances that they intended to perform on their obligations under the Loan Agreements.

134.    Ms. Ko and Ms. Owen made these statements to delay Ms. Deveney from foreclosing on the CRT shares and to allow them additional time to use CRT's assets, corporate opportunities, goodwill, reputation, and proprietary information to set up a competing entity.

135.    Ms. Ko and Ms. Owen knew that their statements indicating their continued desire to provide the performance promised under the Loan Agreements and to own CRT were false or they were consciously indifferent to the truth of those promises.

136.     Ms. Deveney justifiably relied on Ms. Ko's and Ms. Owen's promises of payment and promises to provide collateral when she agreed to sell her shares of CRT stock by entering into the SPA.  Ms. Deveney would not have entered into the SPAs had Ms. Ko and Ms. Owen not made such misrepresentations.

137.     Ms. Deveney also justifiably relied on Ko and Owen's statements about their intent to live up to their obligations on the Loan Agreements.  Ms. Deveney would have, among other things, defaulted Ko and Owen and foreclosed on the property much more quickly had it not been for those representations.

138.     Ms. Ko's and Ms. Owen's misrepresentations have proximately caused Ms. Deveney to suffer, including the volume of any diverted opportunities from CRT, lost in value of CRT, and lost income, damages in an amount to be proven at trial.

**Count IV (Against Ms. Ko and Ms. Owen)**
**Breach of Fiduciary Duty and Pledge Agreement**

139.     Plaintiffs incorporate by reference the alleged facts in all preceding paragraphs.

140.      After the sale of CRT's stock, Ms. Ko and Ms. Owen took the positions of co-Presidents of CRT, operating as the company's chief executives.

141.     Upon information and belief, Ms. Ko and Ms. Owen were also the only directors of CRT following their purchase of the CRT stock.

142.     As directors and officers of CRT, Ms. Ko and Ms. Owen owed a duty to CRT.

143.     As directors and officers of CRT, Ms. Ko and Ms. Owen also owed a duty to Ms. Deveney, as shareholder and/or the pledgee holding CRT stock for security on payment of the loan.

144.    The Loan Agreement sets forth a pledge relationship whereby Ms. Ko and Ms. Owen as pledgors pledged the shares of CRT to Ms. Deveney as security for the repayment of the Loans.

145.    Pursuant to the Loan Agreements' pledge provisions, Ms. Ko and Ms. Owen owed a duty to Deveney not to devalue or harm the collateral that Deveney was holding as pledgee.

146.    Pursuant to these duties, Ms. Ko and Ms. Owen had the duty not to devalue CRT by diverting and transferring CRT assets, information, goodwill, and corporate opportunities to the competing entity that they owned for no value.  Ms. Ko and Ms. Owen also had the duty not to compete with CRT to CRT's detriment.

147.    Ms. Ko and Ms. Owen breached this duty when they diverted and misappropriated CRT's assets, information, goodwill, and corporate opportunities to THI for no consideration.

148.    Ms. Ko's and Ms. Owen's breaches of fiduciary duty have proximately caused Ms. Deveney and CRT to suffer damages in an amount to be proven at trial, including loss of business and loss of income damages.

### Count V (Against THI)
### Aiding and Abetting Breach of Fiduciary Duty

149.    Plaintiffs incorporate by reference the alleged facts in all preceding paragraphs.

150.     After the sale of CRT's stock, Ms. Ko and Ms. Owen took the positions of co-Presidents of CRT, operating as the company's chief executives.

151.    Upon information and belief, Ms. Ko and Ms. Owen were also the only directors of CRT following their purchase of the CRT stock.

152.    As directors and officers of CRT, Ms. Ko and Ms. Owen owed a duty to CRT.

153.    As directors and officers of CRT, Ms. Ko and Ms. Owen also owed a duty to Deveney, as the pledgee holding CRT stock for security on payment of the loan.

154.    Pursuant to this duty, Ms. Ko and Ms. Owen had the duty not to devalue CRT by diverting and transferring CRT assets, information, goodwill, and corporate opportunities to the competing entity that they owned for no value.  Ms. Ko and Ms. Owen also had the duty not to compete with CRT to CRT's detriment.

155.    THI knew of these duties.

156.    Ms. Ko and Ms. Owen breached this duty when they diverted and misappropriated CRT's assets, information, goodwill, and corporate opportunities to THI for no consideration.

157.    Despite knowing about these duties, THI aided and abetted Ms.  and Owen's breach of those duties by, among other things, accepting CRT assets and opportunities for limited to no value and distributing CRT material to third parties that it received from Ko and Ms. Owen.

158.    THI's breaches of fiduciary duty have proximately caused Ms. Deveney and CRT to suffer damages in an amount to be proven at trial.

**Count VI (Against Ms. Ko and Ms. Owen)**
**Breach of NDA and Noncompetition Agreements**

159.    Plaintiffs incorporate by reference the alleged facts in all preceding paragraphs.

160.    Before entering into discussions about purchasing the agreement, Ms. Ko and Ms. Owen both signed the NDA and Noncompete Agreement.

161.    The NDA and Noncompete Agreements are valid, binding, and enforceable agreements.

162.    Pursuant to the terms of the NDA and Noncompete Agreements, Ms. Ko and Ms. Owen were barred from using confidential information that they learned about during their diligence discussions.

163.    Also pursuant to the terms of the NDA and Noncompete Agreements, Ko and Owen were prohibited from participating in similar businesses to CRT or from soliciting CRT's instructors and other partners for a period of five years.

164.    Before starting as an independent instructor at CRT, Ms. Ko and Ms. Owen entered into Independent Instructor Agreements.

165.    The Independent Instructor Agreements were binding, valid, and enforceable agreements governing Ms. Ko's and Ms. Owen's relationship as instructors for CRT.

166.    Pursuant to the Intendent Instructor Agreement, Ms. Ko and Ms. Owen were prohibited from competing in a business similar to CRT or soliciting CRT's instructors for a period of two years after the term of the Agreement, which extended at least through the purchase date.

167.    Ko and Owen's Independent Instructor Agreements also barred them from using confidential information disclosed to them in connection with those agreements.

168.    Ms. Ko and Ms. Owen have violated the terms of their Independent Instructor Agreements and NDA and Noncompete Agreements by, among other things, opening THI, a business designed to compete with CRT and offer courses identical to those CRT offers and soliciting CRT instructors to join that business.

169.    Ms. Ko and Ms. Owen have violated the terms of their Independent Instructor Agreements and NDA and Noncompete Agreements by, among other things, disclosing or

improperly using confidential information that they obtained in connection with those agreements to offer nearly identical courses and to sell those courses to others.

170.    Ms. Ko and Ms. Owen's conduct has irreparably harmed CRT by, among other things, allowing CRT's confidential information to be used on the marketplace in favor of a competitor and by allowing CRT's unique course to be offered on the marketplace by a competitor.  This harm will continue if Ms. Ko and Ms. Owen are not enjoined.

171.    Ko and Owen's breaches of fiduciary duty have proximately caused CRT to suffer damages in an amount to be proven at trial, including reasonable attorneys' fees.

172.    CRT is also entitled to injunctive relief.

### Count VII (Against All Defendants)
### Misappropriation of Trade Secrets

173.    CRT incorporates by reference the alleged facts in all preceding paragraphs.

174.    The New Hampshire Uniform Trade Secrets Act and the Massachusetts Trade Secrets Act prohibit the misappropriation of trade secrets.  *See* R.S.A. 350-B; Mass. G.L.c. 93, § 42.

175.    CRT has developed and owns valuable trade secrets related to the teaching methodologies that it uses in its courses.

176.    These trade secrets have value because they are not generally known to the public and are not readily ascertainable.

177.    CRT's trade secrets also include financial, economic and customer information, including non-public information relating to its longstanding customer relationships, proposals and work for new customers, bid and pricing information, proposal response strategies, and CRT's business, marketing, and sales strategies for economic growth.

178.    CRT has taken reasonable measures to safeguard its trade secrets.  For instance, CRT implemented confidentiality agreements with its independent instructors that prohibit the disclosure of confidential information.  CRT has also limited access to confidential information to only those of its partners who need such access.  CRT has also stored its information on password protected storage drives.

179.    Defendants used improper means to acquire and use CRT's trade secrets while knowing that the acquisition and use was improper.

180.    As a consequence of Defendants' conduct, CRT has suffered harm in an amount to be proven at trial.

## Count VIII (Against All Defendants)
## Tortious Interference with Prospective Business Relations

181.    Plaintiffs incorporate by reference the alleged facts in all preceding paragraphs.

182.    CRT had a business relationship or contemplated contract of economic benefit with several potential counterparties, including (among others) Alliant and The Chicago School.

183.    Defendants knew about these relationships and contemplated contracts.

184.    Defendants intentionally, wrongfully, and maliciously interfered with those contemplated contracts.  They did so by, among other things, diverting the opportunities to THI, an entity that Defendants falsely represented was either CRT under a different name or the parent company of CRT.

185.    Defendants also intentionally, wrongfully, and maliciously interfered with contemplated CRT contracts by diverting those opportunities to THI when they were under a duty to preserve the value of CRT and to not harm CRT or Deveney.

186.    As a direct result of Defendants' interference, CRT lost the advantage associated with these prospective business relationships.

187.    Defendants' conduct has proximately caused CRT to suffer damages in an amount to be proven at trial.

### Count IX (Against All Defendants)
### Violation of the Copyright Act (17 U.S.C. §§ 501, *et seq.*)

188.    Plaintiffs incorporate by reference the alleged facts in all preceding paragraphs.

189.    CRT has created several original works that allow it and its instructors to market and provide mediation courses to students.

190.    This material includes, among other things, the divorce mediation certificate program student book and the promotional and marketing material posted on CRT's website.

191.    CRT is the valid and exclusive owner of the copyrights for the divorce mediation certificate program student book and the material on its website.

192.    Defendants violated the copyright act by making commercial use of this material, including providing near verbatim and substantially similar copies of this material to their university partners for monetary gain and providing copies of the material for THI's and others' uses.

193.    Defendants therefore violated the copyright act by infringing on CRT's valid copyright.

194.    The use of CRT's copyright protected material by a competitor irreparably harms CRT by diminishing its reputation, goodwill, and potential relationships with other customers. CRT is therefore entitled to injunctive relief because it is being irreparably harmed and will continue to be irreparably harmed unless Defendants are enjoined from continuing to copyright CRT's information.

195.    Defendants' infringement of CRT's copyright have proximately caused CRT to suffer damages in an amount to be proven at trial.

**Count X (Against All Defendants)**
**Violation of the Copyright Act – Contributory Infringement**

196.    Plaintiffs incorporate by reference the alleged facts in all preceding paragraphs.

197.    CRT has created several original works that allow it and its instructors to market and provide mediation courses to students.

198.    This material includes, among other things, the divorce mediation certificate program student book and the promotional and marketing material posted on CRT's website.

199.    CRT is the valid and exclusive owner of the copyrights for the divorce mediation certificate program student book and the material on its website.

200.    Defendants violated the copyright act by making commercial use of this material, including providing near verbatim and substantially similar copies of this material to their university partners for monetary gain.

201.    Ko, Owen, and THI misled their university partners into believing that THI was CRT with a changed name or was the parent or subsidiary of CRT and that the partners had authorization to use CRT's copyrighted work, when they did not.

202.    Given these misrepresentations, THI's university partners, the Chicago School and Alliant University, proceeded to copy and post CRT's marketing material to their website to market THI's courses and used CRT's course materials to offer a knockoff of CRT's divorce mediation certificate program.  The Chicago School and Alliant infringed on CRT's copyright rights.

203.    Defendants materially contributed to The Chicago School's and Alliant's infringement.

204.    Defendants have therefore committed contributory infringement.

205.     The use of CRT's copyright protected material by a competitor irreparably harms CRT by diminishing its reputation, goodwill, and potential relationships with other customers. CRT is thus entitled to injunctive relief prohibiting its contributory infringement because it is being irreparably harm and will continue to be irreparably harmed unless Defendants are enjoined from continuing to copyright CRT's information.

206.     Defendants' contributory infringement of CRT's copyright has proximately caused CRT to suffer damages in an amount to be proven at trial.

### Count XI (Against Ko and Owen)
### Civil Conspiracy

207.     Plaintiffs incorporate by reference the alleged facts in all preceding paragraphs.

208.     Ko and Owen conspired  to (a) fraudulently enter into the CRT purchase transaction for the purpose of obtaining CRT's assets; (b) fraudulently represent to Deveney their intent to remain CRT's owner and pay under the Loan Agreements for the purpose of delaying foreclosure and leveraging CRT's assets;  (c) diminish the value of CRT by transferring assets to other parties; (d) breach fiduciary duties owed Ms. Deveney and CRT; and (e) illegally use CRT's copyrighted material.

209.     Ms. Ko and Ms. Owen came to an agreement on the objectives and course of action to achieve the objectives.

210.     Ms. Ko and Ms. Owen carried out several overt acts described above to further the conspiracy.

211.     As a direct result of Ms. Ko's and Ms. Owen's conduct, Plaintiffs have been harmed in an amount to be proved at trial.

### Count XII (Against THI)
### Tortious Interference with Contract

212.     Plaintiffs incorporate by reference the alleged facts in all preceding paragraphs.

213.    Plaintiffs had valid and binding contracts with Ms. Ko and Ms. Owen, including Ko and Owen's NDA and Noncompete Agreement with CRT and Ko and Owen's Loan Agreements with Ms. Deveney.

214.    THI knew about these contracts.

215.    THI interfered with Ms. Ko's and Ms. Owen's contract with Ms. Deveney by accepting assets from CRT that devalued and harmed the security of the shares that Ms. Deveney was holding in pledge.

216.    THI interfered with Ms. Ko's and Ms. Owen's contract with CRT by using Ms. Ko and Ms. Owen to compete with CRT, despite both having signed restrictive covenants not to do so.

217.    As a direct result of THI's conduct, Plaintiffs have been harmed in an amount to be proved at trial.

## PRAYER FOR RELIEF

WHEREFORE, Ms. Deveney and Conflict Resolution Training, Inc. respectfully requests that the Court grant them the following relief:

A.  An award of damages to be determined at trial;

B.  An order requiring Defendants to stop competing against CRT;

C.  An order requiring Defendants to stop using CRT's confidential information and to return any confidential information taken from CRT;

D.  Attorneys' fees and costs allowed by law;

E.  Pre- and post-judgment interest as allowed by law; and

F.  Such other and further relief as the Court deems just and proper.

**PLAINTIFFS DEMAND A JURY TRIAL FOR ALL ISSUES SO TRIABLE**

Respectfully submitted,
SUSAN DEVENEY and CONFLICT
RESOLUTION TRAINING, INC.,
By Their Attorneys,

Dated:  February 12, 2025          By: _/s/ Ryan P. Lirette_____
Ryan P. Lirette (Bar No. 19561)
Charles M. Waters, MA (Bar No. #631425)
(*pro hac vice*)
Sheehan Phinney Bass & Green, P.A.
75 Portsmouth Boulevard, Suite 110
Portsmouth, NH 03801
(603) 431-1222
cwaters@sheehan.com;
rlirette@sheehan.com