# EXHIBIT A

# LOAN AGREEMENT

THIS LOAN AGREEMENT (the "Agreement") is made this __3rd__ day of December, 2023, by and among Susan Deveney ("LENDER") and Elizabeth Jewett Owen ("BORROWER"). BORROWER and LENDER shall collectively be known herein as "the Parties." In determining the rights and duties of the Parties under this Agreement, the entire document must be read as a whole.

**A.** **LOAN TERMS**

The BORROWER and LENDER, hereby further set forth their rights and obligations to one another under this Agreement and agree to be legally bound as follows:

    **1.** **Principal Loan Amount $1,185,000**

The Principal Loan Amount of $1,185,000 is for the purchase of shares of stock in Conflict Resolution Training, Inc., a Delaware corporation (the "Corporation") in accordance with the Stock Purchase Agreement executed by the Parties on or about November 14, 2023. The loan will include simple interest of 6% on the Loan Amount which does not include the Down Payment reflected in section A2a below. Simple interest will be calculated against the sum of $1,035,000 only.

    **2.** **Loan Repayment Terms.**

BORROWER will make payment(s) to LENDER as follows:

        a.    $150,000 (Down Payment) on or before December 31, 2023,

        b.    $62,500.00 on or before March 31, 2023,

        c.    $62,500.00 on or before June 30, 2024,

        d.    $62,500.00 on or before September 30, 2024,

        e.    $62,500.00 on or before December 31, 2024,

        f.    3.75% of the Gross Corporation Revenue exceeding $600,000 between January 1, 2024 and December 31, 2024, on or before January 31, 2025,

  g.  $62,500.00 on or before March 31, 2025,

  h.  $62,500.00 on or before June 30, 2025,

  i.  $62,500.00 on or before September 30, 2025,

  j.  $62,500.00 on or before December 31, 2025,

  k.  3.75% of the Gross Corporation Revenue exceeding $600,000 between January 1, 2025 and December 31, 2025, on or before January 31, 2026,

  l.  $62,500.00 on or before March 31, 2026,

  m.  $62,500.00 on or before June 30, 2026,

  n.  $62,500.00 on or before September 2026,

  o.  $62,500.00 on or before December 31, 2026,

  p.  3.75% of the Gross Corporation Revenue exceeding $600,000 between January 1, 2026 and December 31, 2026, on or before January 31, 2027

  q.  $391,782.00 less all monies received from Gross Corporate Revenues received pursuant to paragraphs 2 f, 2 k and 2 p above to be paid on or before March 31, 2027.

**3.  Collateral**

i.  In addition to all the remedies set forth herein, BORROWER shall execute a deed of trust and associated promissory note (collectively the "DOT") for each of the following properties in favor of LENDER:

  1.  72 Allmeroth Street, Rochester, NY 14620
  2.  130 Elmwood Avenue, Rochester, NY 14611
  3.  120 Elmwood Avenue, Rochester, NY 14611

which DOT shall be held by LENDER until the earlier to occur of (i) an Uncured Default as set forth in Section A6(3) below, or (ii) the full payoff of the Loan. The DOT shall be held by LENDER and shall not be recorded unless or until the occurrence of an uncured default as described in A6(3) below. As the collateral is owned by Creative Construction LLC, a New York

Limited Liability Company ("Creative Construction"), and as a requirement to enter into this Agreement, Matthew F. Owen shall execute this Agreement on behalf of and as the managing member of Creative Construction. By his signature hereto, Matthew F. Owen on behalf of Creative Construction LLC and as its managing member, hereby confirms, agrees and accepts that the three properties aforementioned, owned by Creative Construction LLC, are hereby pledged as collateral for and on behalf of BORROWER with respect to this Agreement. Further, Matthew F. Owen on behalf of Creative Construction LLC has the power and authority to so pledge the properties as collateral with respect to this Agreement.

      ii.    Stock Certificates representing fifty Percent (50%) of the Corporation's stock shall be conveyed and transferred to PURCHASER pursuant to the terms of the Stock Purchase Agreement. PURCHASER hereby authorizes LENDER's transfer agent to maintain said stock certificates during the term of this Agreement. In the event of an Uncured Default, as discussed below in section A63 LENDER's transfer agent is authorized to transfer, convey, and deliver said stock certificates to LENDER. Upon the event of all obligations under this Agreement having been fully satisfied by BORROWER, LENDER's transfer agent shall deliver said stock certificates to BORROWER.

    **4.**    **Method of Loan Payment.**

The BORROWER shall make all payments called for under this loan agreement by wire transfer or other negotiable instrument made payable to the following:

        Wire Funds to: J.P. Morgan Chase, NY

        Routing Number: 021000021

        For Credit to: National Financial Services LLC

        Account Number: 066196-221

        For the Benefit of: Susan E Deveney

        For Final Credit to: 39900000578863030

        Address: 383 Madison Avenue

        New York, NY 10017

If LENDER gives written notice to BORROWER that different instructions or an address shall be used for making payments under this loan agreement, BORROWER shall use the new instructions or address so given by LENDER.

5. **Default.**

The occurrence of any of the following events shall constitute a Default by the BORROWER of the terms of this Agreement:

1) BORROWER'S failure to pay any amount due as principal or interest on the date required under this Agreement.

2) BORROWER seeks an order of relief under the Federal Bankruptcy laws.

3) A federal tax lien is filed against the assets of BORROWER.

6. **Additional Provisions Regarding Default.**

1) Addressee and Address to which LENDER is to give BORROWER written notice of default:

Elizabeth Jewett Owen
30 Whitecliff Drive
Pittsford, NY 14534

If BORROWER gives written notice to LENDER that a different address shall be used, LENDER shall use that address for giving notice of default (or any other notice called for herein) to BORROWER.

Any notice of default will be deemed to have been duly given upon personal delivery, or upon actual receipt or three (3) days after mailing (whichever first occurs) when mailed by registered or certified mail, postage prepaid, return receipt requested, and addressed to the parties at the address as set forth above or at such other addresses as the BORROWER may designate in the manner aforesaid

2) Penalty for Late Payment. Upon receipt of notice of default, as discussed above, BORROWER shall have a 15-day grace period within which BORROWER may pay all amounts due and payable without penalty. Upon the expiration of the 15-day grace period BORROWER shall pay, in addition to all amounts due and owing, a penalty in the amount of $1,000. The

4

penalty must be paid to LENDER within five (5) days after the expiration of the grace period or twenty days after notice of default, whichever occurs first.

      3). Cure of Default.  Upon notice of default, BORROWER shall have 30 days after receipt of written notice of default from LENDER to cure said default.  In the case of default due solely to BORROWER'S failure to make timely payment as called for in this Agreement, BORROWER may cure the default by either:  (i) making full payment of any principal and interest whose payment to LENDER is overdue under the loan agreement and, also, the late-payment penalty described above if applicable; or (ii) release collateral to LENDER as described in paragraph A3 "Collateral", above. Failure to cure a default pursuant to this paragraph shall constitute an "Uncured Default".

      4) If force majeure affects the ability of BORROWER to perform under the contract, the BORROWER shall promptly notify the LENDER and submit to the LENDER a sufficient and valid proof of force majeure within a reasonable period after the discovery of force majeure. Upon notice, BORROWER shall have 90 days after receipt of written notice of default from LENDER to cure said default. Otherwise, the corresponding liability shall not be waived.

      5) Indemnification of Attorney's Fees and Out-of-Pocket Costs.  Should any party materially breach this agreement, the non-breaching party shall be indemnified by the breaching party for its reasonable attorney's fees and out-of-pocket costs which in any way relate to, or were precipitated by, the breach of this agreement.  The term "out-of-pocket costs", as used herein, shall not include lost profits.  An uncured default by BORROWER constitutes a material breach of this agreement by BORROWER.

**B.**      **COVENANT NOT TO COMPETE SOLICIT, OR HIRE**

      **1.**      **Covenant Not To Compete.**

      (a)      In connection with and in support of the sale of the Corporation, LENDER agrees that, other than in conjunction with Professional Services rendered by LENDER pursuant to the Independent Contractor Agreement, LENDER will not, either directly or indirectly, whether as an owner, shareholder, director, officer, member, partner, associate, employee, independent contractor, consultant, agent, or otherwise, without the express written consent of BORROWER, which may be withheld in BORROWER's sole and arbitrary discretion (i) carry

5

on, (ii) have any financial interest in (other than publicly traded companies, as a community property interest, or as a landlord not receiving percentage rent or other income based consideration), (iii) enter into a working relationship with, (iv) engage in the practice of conflict resolution training, including but not limited to, all courses, programs and offerings currently offered by Corporation, projected and anticipated programs and offerings, including but not limited to current and projected licensing offerings or (v) provide Professional Services on behalf of any company that is so engaged, within any part of the Covenant Not To Compete Area as defined below. (vi) engage in licensing, training and/or instruction on how to license and/or train any person or company involved in or offering conflict resolution training or any other practice undertaken by the Corporation. This Covenant Not To Compete ("Covenant Not To Compete") will remain in full force and effect as long as BORROWER, or any person or business entity deriving title to said Corporation, carries on said conflict resolution training within the Covenant Not To Compete Area, but not exceeding three (3) years after the termination of the Loan Agreement.

       (b)    The "Covenant Not To Compete Area" is defined as all of the North America, Europe and Asia.

       2.    **Covenants Not To Solicit, Hire or Accept Referrals**

       (a)    Other than in conjunction with Professional Services rendered by LENDER pursuant to the Independent Contractor Agreement, LENDER agrees that LENDER has not, will not either directly or indirectly, whether as an owner, shareholder, director, officer, member, partner, associate, employee, independent contractor, consultant, agent, or otherwise, on behalf of herself or any other person, firm or corporation, without the express written consent of BORROWER, which may be withheld in BORROWER's sole and arbitrary discretion, during the period ending three (3) years after the termination of the Loan Agreement:

       (1)    derive income or solicit other than on referral from BORROWER or through publicly traded companies or as a landlord not receiving percentage rent or other income-based consideration;

       (2)    solicit, or accept referral from or transfer of, any of Corporation's Referral Sources without the written consent of BORROWER; or



      (3)    solicit any pre-Effective Date of Sale contractor or employee of or hire or transfer and such contractor or employee from, the Corporation without the written consent of BORROWER.

      (b)    The covenants set forth in Section B(2)(a)(1), (2) and (3) above shall collectively be referred to as "Covenants Not To Solicit, Hire or Accept Referrals." The Covenant Not to Compete and the Covenants Not To Solicit, Hire or Accept Referrals may hereinafter be referred to collectively as "Covenants."

      3.    **Additional Provisions Related to the Covenants**

      (a)    The Covenants set forth in Sections B1 and 2 above shall survive the closing of the transaction outlined in this Agreement

      (c)    LENDER and BORROWER have examined the Covenants set forth in Sections A and B in detail and agree that the parameters of such are reasonable in duration, area, scope and otherwise do not impose a greater restraint than is reasonably necessary to protect the BORROWER's goodwill and other legitimate business interests, and that they are not unduly harsh or restrictive on LENDER's ability to earn a livelihood.

      (d)    In the event BORROWER sells or conveys all or a partial interest in the Corporation to a successor person or entity before that applicable Covenant has expired, BORROWER shall be deemed to have assigned (inter alia) the benefits of the Covenants. BORROWER shall provide written notice to LENDER of any such assignment, providing the name of the subsequent or partial owner(s) and the effective date of such sale and conveyance.

      (e)    Each provision of the Covenants will be construed as a personal service agreement and independent of any other provision of this Agreement or any Related Agreement. The sole exception will be that the provisions of this Agreement are dependent on the consummation of the sale of the Corporation's stock. With this sole exception, the existence of any claim or cause of action against BORROWER will not constitute a defense to the enforcement of any Covenant.

      (f)    LENDER represents and warrants that the geographic areas to be restrained adequately represent the areas from which the Corporation has drawn customers in the past.

C.    **MISCELLANEOUS PROVISIONS**

    1.    **Integration.**

This Agreement sets forth the entire agreement between the Parties with regard to the subject matter hereof. All prior agreements, representations, and warranties, express or implied, oral, or written, with respect to the subject matter hereof, are superseded by this agreement. This is an integrated agreement.

    2.    **Severability.**

In the event any provision of this Agreement is deemed to be void, invalid, or unenforceable, that provision shall be severed from the remainder of this Agreement so as not to cause the invalidity or unenforceability of the remainder of this Agreement. All remaining provisions of this Agreement shall then continue in full force and effect. If any provision shall be deemed invalid due to its scope or breadth, such provision shall be deemed valid to the extent of the scope and breadth permitted by law.

    3.    **Modification.**

Except as otherwise provided in this document, this agreement may be modified, superseded, or voided only upon the written and signed agreement of the Parties. Further, the physical destruction or loss of this document shall not be construed as a modification or termination of the agreement contained herein.

    4.    **Exclusive Jurisdiction for Suit in Case of Breach.**

The Parties, by entering into this Agreement, submit to jurisdiction in State of New Hampshire for adjudication of any disputes and/or claims between the Parties under this Agreement. Furthermore, the Parties hereby agree that the courts of State of New Hampshire shall have exclusive jurisdiction over any disputes between the parties relative to this Agreement, whether said disputes sounds in contract, tort, or other areas of the law.

     5.    **State Law.**

This Agreement shall be interpreted under, and governed by, the laws of the State of New Hampshire.

IN WITNESS WHEREOF and acknowledging acceptance and agreement of the foregoing, BORROWER and LENDER affix their signatures hereto.

Dated: 12/3/2023



Signature:
Elizabeth Jewett Owen, Borrower

Dated: 12/4/2023



Signature:
Susan Deveney, Lender

Dated: 12/3/2023



Signature:
Matthew F. Owen, Managing Member
On behalf of Creative Construction LLC

9

# LOAN AGREEMENT

THIS LOAN AGREEMENT (the "Agreement") is made this ___3rd___ day of December, 2023, by and among Susan Deveney ("LENDER") and Katherine Y. Ko ("BORROWER"). BORROWER and LENDER shall collectively be known herein as "the Parties." In determining the rights and duties of the Parties under this Agreement, the entire document must be read as a whole.

**A.     LOAN TERMS**

The BORROWER and LENDER, hereby further set forth their rights and obligations to one another under this Agreement and agree to be legally bound as follows:

1. **Principal Loan Amount $1,185,000**

The Principal Loan Amount of $1,185,000 is for the purchase of shares of stock in Conflict Resolution Training, Inc., a Delaware corporation (the "Corporation") in accordance with the Stock Purchase Agreement executed by the Parties on or about November 14, 2023. The loan will include simple interest of 6% on the Loan Amount which does not include the Down Payment reflected in section A2a below. Simple interest will be calculated against the sum of $1,035,000 only.

2. **Loan Repayment Terms.**

BORROWER will make payment(s) to LENDER as follows:

   a. $150,000 on or before November 14, 2023,

   b. $62,500.00 on or before March 31, 2023,

   c. $62,500.00 on or before June 30, 2024,

   d. $62,500.00 on or before September 30, 2024,

   e. $62,500.00 on or before December 31, 2024,

   f. 3.75% of the Gross Corporation Revenue exceeding $600,000 between January 1, 2024 and December 31, 2024, on or before January 31, 2025,



g.  $62,500.00 on or before March 31, 2025,

h.  $62,500.00 on or before June 30, 2025,

i.  $62,500.00 on or before September 30, 2025,

j.  $62,500.00 on or before December 31, 2025,

k.  3.75% of the Gross Corporation Revenue exceeding $600,000 between January 1, 2025 and December 31, 2025, on or before January 31, 2026,

l.  $62,500.00 on or before March 31, 2026,

m.  $62,500.00 on or before June 30, 2026,

n.  $62,500.00 on or before September 2026,

o.  $62,500.00 on or before December 31, 2026,

p.  3.75% of the Gross Corporation Revenue exceeding $600,000 between January 1, 2026 and December 31, 2026, on or before January 31, 2027

q.  $391,782.00 less all monies received from Gross Corporate Revenues received pursuant to paragraphs 2 f, 2 k and 2 p above to be paid on or before March 31, 2027.

3.  **Collateral**

i.  In addition to all the remedies set forth herein, BORROWER as collateral for repayment of Loan Amount, agrees to transfer forty nine percent (49%) of the issued and outstanding shares of stock in Katherine Y. Ko, Ph.D. & Associates, a Psychological Corporation ("Collateral Shares") to LENDER to be held in trust. Upon Uncured Default as defined below in Section A6(3), LENDER may demand that her transfer agent transfer all Collateral Shares to LENDER in partial satisfaction of the Loan Amount set forth in this Agreement. BORROWER shall execute a promissory note and corporate resolution allowing the transfer of Collateral Shares in favor of LENDER, which shall be held by LENDER until the earlier to occur of (i) an Event of Uncured Default as set forth in Section A6, or (ii) the full payoff of the Loan.

  ii. Stock Certificates representing fifty Percent (50%) of the Corporation's stock shall be conveyed and transferred to PURCHASER pursuant to the terms of the Stock Purchase Agreement. PURCHASER hereby authorizes LENDER's transfer agent to maintain said stock certificates during the term of this Agreement. In the event of an uncured default, as discussed below in section A6 LENDER's transfer agent is authorized to transfer, convey, and deliver said stock certificates to LENDER. Upon the event of all obligations under this Agreement having been fully satisfied by BORROWER, LENDER's transfer agent shall deliver said stock certificates to BORROWER.

  4. **Method of Loan Payment.**

The BORROWER shall make all payments called for under this loan agreement by wire transfer or other negotiable instrument made payable to the following:

    Wire Funds to: J.P. Morgan Chase, NY

    Routing Number: 021000021

    For Credit to: National Financial Services LLC

    Account Number: 066196-221

    For the Benefit of: Susan E Deveney

    For Final Credit to: 39900000578863030

    Address: 383 Madison Avenue

    New York, NY 10017

If LENDER gives written notice to BORROWER that different instructions or an address shall be used for making payments under this loan agreement, BORROWER shall use the new instructions or address so given by LENDER.

  5. **Default.**

  The occurrence of any of the following events shall constitute a Default by the BORROWER of the terms of this Agreement:

  1) BORROWER'S failure to pay any amount due as principal or interest on the date required under this Agreement.

  2) BORROWER seeks an order of relief under the Federal Bankruptcy laws.

3) A federal tax lien is filed against the assets of BORROWER.

Default is subject to the notice requirements and grace periods as provided for in Section A6(1) of this agreement.

6. **Additional Provisions Regarding Default.**

1) Addressee and Address to which LENDER is to give BORROWER written notice of default:

Katherine Y. Ko
12830 Stevens Drive
Tustin, CA 92782

If BORROWER gives written notice to LENDER that a different address shall be used, LENDER shall use that address for giving notice of default (or any other notice called for herein) to BORROWER.

Any notice of default will be deemed to have been duly given upon personal delivery, or upon actual receipt or three (3) days after mailing (whichever first occurs) when mailed by registered or certified mail, postage prepaid, return receipt requested, and addressed to the parties at the address as set forth above or at such other addresses as the BORROWER may designate in the manner aforesaid

2) Penalty for Late Payment. Upon receipt of notice of default, as discussed above, BORROWER shall have a 15-day grace period within which BORROWER may pay all amounts due and payable without penalty. Upon the expiration of the 15-day grace period BORROWER shall pay, in addition to all amounts due and owing, a penalty in the amount of $1,000. The penalty must be paid to LENDER within five (5) days after the expiration of the grace period or twenty days after notice of default, whichever occurs first.

3) Cure of Default. Upon notice of default, BORROWER shall have 30 days after receipt of written notice of default from LENDER to cure said default. In the case of default due solely to BORROWER'S failure to make timely payment as called for in this Agreement, BORROWER may cure the default by either: (i) making full payment of any principal and interest whose payment to LENDER is overdue under the loan agreement and, also, the late-payment penalty described above if applicable; or (ii) release collateral to LENDER as described in paragraph A3

"Collateral", above. Failure to cure a default pursuant to this paragraph shall constitute an "Uncured Default.

4) If force majeure affects the ability of BORROWER to perform under the contract, the BORROWER shall promptly notify the LENDER and submit to the LENDER a sufficient and valid proof of force majeure within a reasonable period after the discovery of force majeure. Upon notice, BORROWER shall have 90 days after receipt of written notice of default from LENDER to cure said default. Otherwise, the corresponding liability shall not be waived.

5) Indemnification of Attorney's Fees and Out-of-Pocket Costs.  Should any party materially breach this agreement, the non-breaching party shall be indemnified by the breaching party for its reasonable attorney's fees and out-of-pocket costs which in any way relate to, or were precipitated by, the breach of this agreement.  The term "out-of-pocket costs", as used herein, shall not include lost profits.  An uncured default by BORROWER constitutes a material breach of this agreement by BORROWER.

7. **Good Faith Attempt to Refinance.**

The BORROWER shall have the right to prepay this Loan Agreement, in whole or in part, at any time without penalty.

(i) Notwithstanding the right to prepay this Loan Agreement BORROWER agrees to use her best efforts to refinance this Loan Agreement within twenty four (24) months of the date of the execution of this Agreement.

B. **COVENANT NOT TO COMPETE SOLICIT, OR HIRE**

1. **Covenant Not To Compete.**

(a) In connection with and in support of the sale of the Corporation, LENDER agrees that, other than in conjunction with Professional Services rendered by LENDER pursuant to the Independent Contractor Agreement, LENDER will not, either directly or indirectly, whether as an owner, shareholder, director, officer, member, partner, associate, employee, independent contractor, consultant, agent, or otherwise, without the express written consent of BORROWER, which may be withheld in BORROWER's sole and arbitrary discretion (i) carry on, (ii) have any financial interest in (other than publicly traded companies, as a community

5

property interest, or as a landlord not receiving percentage rent or other income based consideration), (iii) enter into a working relationship with, (iv) engage in the practice of conflict resolution training, including but not limited to, all courses, programs and offerings currently offered by Corporation, projected and anticipated programs and offerings, including but not limited to current and projected licensing offerings or (v) provide Professional Services on behalf of any company that is so engaged, within any part of the Covenant Not To Compete Area as defined below. (vi) engage in licensing, training and/or instruction on how to license and/or train any person or company involved in or offering conflict resolution training or any other practice undertaken by the Corporation. This Covenant Not To Compete ("Covenant Not To Compete") will remain in full force and effect as long as BORROWER, or any person or business entity deriving title to said Corporation, carries on said conflict resolution training within the Covenant Not To Compete Area, but not exceeding three (3) years after the termination of the Loan Agreement.

      (b)    The "Covenant Not To Compete Area" is defined as all of the North America, Europe and Asia.

      2.    **Covenants Not To Solicit, Hire or Accept Referrals**

      (a)    Other than in conjunction with Professional Services rendered by LENDER pursuant to the Independent Contractor Agreement, LENDER agrees that LENDER has not, will not either directly or indirectly, whether as an owner, shareholder, director, officer, member, partner, associate, employee, independent contractor, consultant, agent, or otherwise, on behalf of herself or any other person, firm or corporation, without the express written consent of BORROWER, which may be withheld in BORROWER's sole and arbitrary discretion, during the period ending three (3) years after the termination of the Loan Agreement:

      (1)    derive income or solicit other than on referral from BORROWER or through publicly traded companies or as a landlord not receiving percentage rent or other income based consideration;

      (2)    solicit, or accept referral from or transfer of, any of Corporation's Referral Sources without the written consent of BORROWER; or

(3) solicit any pre-Effective Date of Sale contractor or employee of, or hire or transfer and such contractor or employee from, the Corporation without the written consent of BORROWER.

(b) The covenants set forth in Section B(2)(a)(1), (2) and (3) above shall collectively be referred to as "Covenants Not To Solicit, Hire or Accept Referrals."

The Covenant Not to Compete and the Covenants Not To Solicit, Hire or Accept Referrals may hereinafter be referred to collectively as "Covenants."

3. **Additional Provisions Related to the Covenants**

(a) The Covenants set forth in Sections B1 and 2 above shall survive the closing of the transaction outlined in this Agreement

(c) LENDER and BORROWER have examined the Covenants set forth in Sections A and B in detail and agree that the parameters of such are reasonable in duration, area, scope and otherwise do not impose a greater restraint than is reasonably necessary to protect the BORROWER's goodwill and other legitimate business interests, and that they are not unduly harsh or restrictive on LENDER's ability to earn a livelihood.

(d) In the event BORROWER sells or conveys all or a partial interest in the Corporation to a successor person or entity before that applicable Covenant has expired, BORROWER shall be deemed to have assigned (inter alia) the benefits of the Covenants. BORROWER shall provide written notice to LENDER of any such assignment, providing the name of the subsequent or partial owner(s) and the effective date of such sale and conveyance.

(e) Each provision of the Covenants will be construed as a personal service agreement and independent of any other provision of this Agreement or any Related Agreement. The sole exception will be that the provisions of this Agreement are dependent on the consummation of the sale of the Corporation's stock. With this sole exception, the existence of any claim or cause of action against BORROWER will not constitute a defense to the enforcement of any Covenant.

(f)   LENDER represents and warrants that the geographic areas to be restrained adequately represent the areas from which the Corporation has drawn customers in the past.

C.   **MISCELLANEOUS PROVISIONS**

1.   **Integration.**

This Agreement sets forth the entire agreement between the Parties with regard to the subject matter hereof. All prior agreements, representations, and warranties, express or implied, oral, or written, with respect to the subject matter hereof, are superseded by this agreement. This is an integrated agreement.

2.   **Severability.**

In the event any provision of this Agreement is deemed to be void, invalid, or unenforceable, that provision shall be severed from the remainder of this Agreement so as not to cause the invalidity or unenforceability of the remainder of this Agreement. All remaining provisions of this Agreement shall then continue in full force and effect. If any provision shall be deemed invalid due to its scope or breadth, such provision shall be deemed valid to the extent of the scope and breadth permitted by law.

3.   **Modification.**

Except as otherwise provided in this document, this agreement may be modified, superseded, or voided only upon the written and signed agreement of the Parties. Further, the physical destruction or loss of this document shall not be construed as a modification or termination of the agreement contained herein.

4.   **Exclusive Jurisdiction for Suit in Case of Breach.**

The Parties, by entering into this Agreement, submit to jurisdiction in State of New Hampshire for adjudication of any disputes and/or claims between the Parties under this Agreement. Furthermore, the Parties hereby agree that the courts of State of New Hampshire shall have exclusive jurisdiction over any disputes between the parties relative to this Agreement, whether said disputes sounds in contract, tort, or other areas of the law.

5. **State Law.**

This Agreement shall be interpreted under, and governed by, the laws of the State of New Hampshire.

IN WITNESS WHEREOF and acknowledging acceptance and agreement of the foregoing, BORROWER and LENDER affix their signatures hereto.

Dated: 12/3/2023

Signature: *Katherine Ko*

Katherine Y. Ko, Borrower

Dated: 12/4/2023

Signature: *Susan Deveney*

Susan Deveney, Lender